# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued April 5, 2007         Decided May 11, 2007

No. 05-1328

CITY OF DANIA BEACH, FLORIDA, ET AL.,
PETITIONERS

v.

FEDERAL AVIATION ADMINISTRATION,
RESPONDENT

On Petition for Review of an Order of the
Federal Aviation Administration

*T. Neal McAliley* argued the cause for petitioners. With him
on the briefs was *Francis A. Vasquez, Jr.*

*Todd S. Aagaard*, Attorney, U.S. Department of Justice,
argued the cause for respondent. With him on the brief was *Lisa
E. Jones*, Attorney.

Before: SENTELLE, TATEL and BROWN, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* SENTELLE.

SENTELLE, *Circuit Judge*: Petitioners seek review of a
Federal Aviation Administration ("FAA") letter that allegedly
changed the runway use procedures at Fort Lauderdale-
Hollywood International Airport. They argue that the new

procedures will route more jet aircraft onto two previously restricted runways, thus increasing noise, soot, and exhaust fumes over residential areas. Petitioners contend that the FAA made this change without engaging in the required environmental review process. The FAA argues that the letter is not reviewable because it merely explains the existing procedures and does not actually change the manner in which the runways will be used. We hold that the letter is a reviewable "final order," and we grant the petition for review.

**I.**

Fort Lauderdale-Hollywood International Airport ("FLL") is a busy and fast-growing airport located near several residential communities. FLL has three runways – two parallel east-to-west runways ("9L/27R" and "9R/27L") and one "crosswind" northwest-to-southeast runway ("13/31").

In 1995, the FAA approved a "noise compatibility program" to minimize airport noise over residential communities near FLL. *Approval of Noise Compatibility Program, Ft. Lauderdale-Hollywood Int'l Airport*, 60 Fed. Reg. 65,373 (Dec. 19, 1995). Under this program, "Runway 9L is the preferred runway," and "[a]ll turbojet arrivals and departures will use Runway 9L-27R." *Id.* at 65,374. Since the noise compatibility program was adopted, runway 9L/27R has been the primary runway for jet traffic, while runways 13/31 and 9R/27L (the "secondary runways") are used mostly for general aviation and commuter traffic. The secondary runways have occasionally been used for jet traffic during high winds, maintenance on the primary runway, and special events such as air shows.

In recent years, air traffic at FLL has greatly increased, and the airport has become prone to delays and congestion. On several occasions in 2004 and 2005, the FAA sought permission from Broward County aviation officials to use runway 9R/27L for jet traffic at specified dates and times to reduce traffic congestion. For example, on March 16, 2005, the FAA air traffic manager wrote a letter to a county official stating that FLL was experiencing "near record traffic on a daily basis," and requesting permission to use runway 9R/27L for five days to "mitigate the possible delays" during peak travel hours. Broward County officials granted at least one of the FAA's requests to use runway 9R/27L to mitigate delays (for March 4-6, 2005). However, the Broward County Director of Aviation also made clear that the approval to use 9R/27L was limited to the specific times and dates requested by the FAA, and that any future use of this runway was contingent upon "specific authorization" from the County.

On June 23, 2005, the FAA's Director of Eastern Terminal Operations wrote a letter to the Broward County Director of Aviation stating that the FAA has authority to use "all available runways" to reduce congestion. The letter emphasized that delays were getting worse at FLL, and that this congestion was causing "an adverse effect throughout the national airspace system, particularly in the northeastern United States." To mitigate the delays, the FAA stated that it "will continue to accommodate requests for use of the preferential runway [9L/27R]," but that it "will allow use of all available runways" when air traffic cannot be accommodated efficiently on the preferred runway. To justify this policy, the FAA pointed to Broward County aviation ordinances, which permit jet operations on runway 13/31 when "operational necessity" requires such use. The letter continued:

4

It is our intent to only assign the use of Runway 13/31 and Runway 9R/27L when it is necessary because of the traffic demands. We anticipate this will generally be during peak hours when the demand exceeds the use of the preferred runway.

The letter emphasized that the FAA was "not proposing to change the informal runway use program" at FLL, and that "[a]ll arrivals and departures will operate within existing procedures."

The petitioners in this case are two cities in Florida – Hollywood and Dania Beach – and two individuals who reside near FLL. Petitioners seek review of the FAA's June 23, 2005 letter. They argue that the letter is a reviewable "final order" because it changes air traffic control procedures at FLL by authorizing the use of the two secondary runways (13/31 and 9R/27L) to reduce delays and congestion. Petitioners contend that the letter should be set aside because the FAA issued this order without engaging in the environmental review process required by the National Environmental Policy Act ("NEPA") and the Transportation Act.

## II.

The FAA argues that petitioners lack standing to challenge the agency's alleged failure to follow the procedural requirements of NEPA. In particular, the FAA asserts that any injuries suffered by the petitioners are too speculative to establish injury-in-fact, and that these injuries could not have been caused by the June 23, 2005 letter, which does not change runway use procedures at FLL. To the contrary, we hold that petitioners have met the threshold requirements of Article III by establishing "procedural injury" as a result of the FAA's alleged failure to engage in the environmental review process required by NEPA.

In order to satisfy the "irreducible constitutional minimum of standing," a litigant must show that it has suffered a "concrete and particularized" injury that is actual or imminent, caused by or fairly traceable to the act being challenged in the litigation, and redressable by the court. *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 663 (D.C. Cir. 1996) (en banc). In cases in which a party has been accorded a procedural right to protect his concrete interests, "the primary focus of the standing inquiry is not the imminence or redressability of the injury to the plaintiff, but whether a plaintiff who has suffered personal and particularized injury has sued a defendant who has caused that injury." *Id.* at 664 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 572 n.7 (1992)).

To establish injury-in-fact in a "procedural injury" case, petitioners must show that "the government act performed without the procedure in question will cause a distinct risk to a particularized interest of the plaintiff." *Fla. Audubon Soc'y*, 94 F.3d at 664. In other words, petitioners must be seeking to "enforce a procedural requirement the disregard of which could impair a separate concrete interest of theirs." *Lujan*, 504 U.S. at 572. We have held that "[a] violation of the procedural requirements of a statute is sufficient to grant a plaintiff standing to sue, so long as the procedural requirement was designed to protect some threatened concrete interest of the plaintiff." *City of Waukesha v. EPA*, 320 F.3d 228, 234 (D.C. Cir. 2003) (internal quotation marks omitted). As the Supreme Court has stated, the purpose of NEPA is to integrate environmental review into the agency decisionmaking process to ensure that "environmental values and consequences have been considered during the planning stage of agency actions." *Andrus v. Sierra Club*, 442 U.S. 347, 350-51 (1979). We have little difficulty concluding that the injuries asserted by petitioners are exactly the types of injuries that NEPA's procedural requirements were intended to mitigate. To the extent that the FAA has authorized

increased use of the secondary runways at FLL, petitioners – who live in close proximity to the airport – will be even more susceptible to these injuries in the future. For example, petitioner Marco Salvino stated in his declaration that he lives "adjacent to the southern border" of FLL, and that when runway 9R/27L is used for jet traffic, he is subject to "piercing" noise that "sound[s] like a missile." Similarly, when runway 13/31 is used for jet traffic, Mr. Salvino is affected by "severe" noise, the smell of jet exhaust, and a "sheen" of "black residue" on his swimming pool and his car. The procedural requirements of NEPA were designed to protect persons – such as Mr. Salvino – who might be injured by hasty federal actions taken without regard for possible environmental consequences. *See Andrus,* 442 U.S. at 351 (noting that the purpose of NEPA was to prevent environmental factors from being "ignored and omitted from consideration in the early stages of planning" (citation omitted)). And Mr. Salvino has adequately demonstrated that the FAA's failure to follow the NEPA procedures poses a "distinct risk" to his "particularized interests"– given the location of his home, he is uniquely susceptible to injury resulting from increased use of the secondary runways.

Petitioners have also met their burden of establishing causation and redressability. A plaintiff asserting procedural injury "never has to prove that if he had received the procedure the substantive result would have been altered." *Sugar Cane Growers Coop. v. Veneman*, 289 F.3d 89, 94 (D.C. Cir. 2002). Though this Court will assume a causal relationship between the procedural defect and the final agency action, the petitioners must still demonstrate a causal connection between the agency action and the alleged injury. *Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1160 (D.C. Cir. 2005). As explained in greater detail in the next section, the FAA's June 23, 2005 letter was a new interpretation of the FLL runway usage program that authorized more frequent use of the secondary runways for jet

traffic. Petitioners' injuries are causally linked to this agency action. Based on the location of their homes, petitioners are vulnerable to injury as a result of increased use of the secondary runways at FLL. By authorizing more frequent use of the secondary runways, the FAA's letter makes petitioners more susceptible to injuries resulting from noise, fuel residue, and exhaust fumes. We also hold that petitioners' injuries are redressable in this suit. An agency action that is taken without following the proper environmental review procedures can be set aside by this Court and remanded to the agency for completion of the review process. *See Fla. Audubon Soc'y*, 94 F.3d at 668 (noting that procedural injuries are "easily redressable, as a court may order the agency to undertake the procedure").

The FAA argues that petitioners' injuries are not sufficiently imminent to give rise to standing. The agency notes that there have only been "minor" and "limited" changes in runway use, and thus petitioners' fears of adverse impacts are nothing more than speculation about potential future injuries. However, the Supreme Court has emphasized that "[t]he person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy." *Lujan*, 504 U.S. at 572 n.7. The Court continued:

> [O]ne living adjacent to the site for proposed construction of a federally licensed dam has standing to challenge the licensing agency's failure to prepare an environmental impact statement, even though he cannot establish with any certainty that the statement will cause the license to be withheld or altered, and even though the dam will not be completed for many years.

*Id.* Even if it is true that there has not yet been a significant increase in use of the secondary runways at FLL, this fact would not affect our holding that petitioners have standing. Petitioners' primary allegation is that the FAA has *authorized* increased use of the secondary runways without first engaging in the NEPA environmental review process. Even if the traffic on these runways will not increase noticeably for several more years, the FAA's failure to follow the proper review procedures before authorizing such use is sufficient under *Lujan* to give rise to procedural injury.[1]

### III.

The FAA also argues that we lack jurisdiction over this petition for review because the June 23, 2005 letter was not a "final order." The agency asserts that the letter is not an order because it merely "explains" the existing runway use program and "informs" the County about the current state of air traffic at FLL. We disagree. At the very least, the letter provides a new interpretation of the FLL noise compatibility program, and thus we hold that it is a reviewable "final order."[2]

---

[1]This is not to suggest that the requirement of imminence vanishes from the standing analysis, only that in the context of procedural injury the standard is relaxed. *See, e.g.*, *Ctr. for Law & Educ.*, 396 F.3d at 1157 ("Where plaintiffs allege injury resulting from violation of a *procedural* right afforded to them by statute and designed to protect their threatened concrete interest, the courts relax—while not wholly eliminating—the issues of imminence and redressability . . . .").

[2]The FAA argues that it is not reinterpreting or otherwise changing the noise compatibility program, but the allegations of the petitioner and the scant record available suggest that in fact the interpretation is new and that action taken on the new interpretation has the potential for inflicting injury upon the petitioners. Our

Petitioners seek review of the FAA's letter under 49 U.S.C. § 46110(a), which states in relevant part:

> [A] person disclosing a substantial interest in an order issued by the Secretary of Transportation . . . may apply for review of the order by filing a petition for review in the United States Court of Appeals for the District of Columbia Circuit . . . .

Several courts have emphasized that the term "order" in this provision should be read "expansively." *See Aviators for Safe & Fairer Regulation v. FAA*, 221 F.3d 222, 225 (1st Cir. 2000) (noting that "[t]he term 'order' is read expansively in review statutes generally and this statute specifically" (citations omitted)); *New York v. FAA*, 712 F.2d 806, 808 (2d Cir. 1983). A reviewable order under 49 U.S.C. § 46110(a) "must possess the quintessential feature of agency decisionmaking suitable for judicial review: finality." *Village of Bensenville v. FAA*, 457 F.3d 52, 68 (D.C. Cir. 2006). To be deemed "final," an order must mark the "consummation" of the agency's decisionmaking process, and must determine "rights or obligations" or give rise to "legal consequences." *Id.* (quoting *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)). *See also Aerosource, Inc. v. Slater*, 142 F.3d 572, 578 (3d Cir. 1998) (defining "order" in this statute as an agency action that "impose[s] an obligation, den[ies] a right, or fix[es] some legal relationship").

At the outset, we have little difficulty concluding that the June 2005 letter is the consummation of the FAA's decisionmaking process. Nothing in the letter indicates that the FAA's statements and conclusions are tentative, open to further

disposition of the case will permit the development of a record for resolution of any factual dispute as to the accuracy of the allegations while providing a more complete record for review.

consideration, or conditional on future agency action. *Compare Bensenville*, 457 F.3d at 69 (holding that an FAA letter was not "final" because it "only affects [petitioners'] rights adversely on the contingency of future administrative action").

The next question is whether the letter is an agency action that determines "rights or obligations" or has "legal consequences." Petitioners argue that the letter is reviewable because use of the secondary runways to alleviate traffic congestion is flatly inconsistent with the FLL noise compatibility program, which states that "all" turbojet traffic shall use runway 9L/27R. *Approval of Noise Compatibility Program,* 60 Fed. Reg. at 65,374. Based on the prior actions of the FAA and the County, we do not believe the word "all" should be interpreted quite so literally. The noise compatibility program has never been interpreted as categorically prohibiting controllers from using the secondary runways for jet traffic. Indeed, both parties acknowledge that runways 9R/27L and 13/31 have been used for jet traffic in the past because of weather conditions, special events, and maintenance on the primary runway.

Nonetheless, we hold that the June 23, 2005 letter is a reviewable final order because it authorizes the use of the secondary runways to alleviate traffic congestion at FLL. There is no question that this is a *new* interpretation of the noise compatibility program. Prior to the issuance of this letter, the FAA had never interpreted the program to permit use of the secondary runways to reduce congestion and delays. As counsel for the FAA conceded at oral argument, there is no evidence in the administrative record that runway 13/31 has ever been used to reduce delays. Similarly, runway 9R/27L has been used for jet traffic on a limited basis to alleviate congestion during peak travel hours, but the FAA has always sought permission from Broward County officials before using 9R/27L for this purpose.

In March 2005, the FAA brought a team of air traffic control experts to FLL to analyze different procedures for managing congestion at the airport. In their report, these experts stated that increased use of runway 9R would relieve congestion, but that the FAA "needs to request, in advance, permission from the airport authority for use of runway 9R for jets for particular periods of known high demand." If the noise compatibility program clearly allowed the FAA to use the secondary runways for jet traffic to alleviate congestion – as the agency now contends – then it would have been unnecessary for the FAA to seek permission from the County before using 9R/27L for this purpose.

In sum, the FAA's 2005 letter provides new marching orders about how air traffic will be managed at FLL. *Cf. Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1023 (D.C. Cir. 2000) (holding that an EPA guidance document had "legal consequences" because the agency "has given the States their 'marching orders'"). Previously, the secondary runways at FLL were used for jet traffic only during bad weather, maintenance on the primary runway, and special events. In contrast, the letter now makes clear that controllers may use "all available runways" for jet traffic to reduce delays. At the very least, the 2005 letter provides a new interpretation of the FLL noise compatibility program in light of the changed circumstances of increased congestion and delays. *See Aviators for Safe & Fairer Regulation*, 221 F.3d at 225 (holding that an FAA "notice of enforcement policy" was a reviewable final order because it "adopts a firm interpretation of an existing regulation"). Accordingly, we hold that the letter is a reviewable "final order" under 49 U.S.C. § 46110(a).

**IV.**

Turning to the merits, petitioners contend that the FAA's letter should be set aside because the agency adopted new runway use procedures at FLL without engaging in the environmental review process required by the National Environmental Policy Act and the Transportation Act.  We agree, and we grant the petition for review.

**A.**

Under the National Environmental Policy Act, federal agencies are required to prepare an environmental impact statement ("EIS") for "every . . . major Federal action[] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).  At a minimum, agencies contemplating a major federal action must prepare an "environmental assessment" to determine whether the action will cause a "significant" environmental impact.  *See* 40 C.F.R. § 1508.9(a); *Sierra Club v. Peterson*, 717 F.2d 1409, 1415 (D.C. Cir. 1983). Even if the agency determines that a full EIS is not required, it must still issue a "finding of no significant impact" explaining why the project is unlikely to have a significant effect on the environment.  *See* 40 C.F.R. § 1508.13; *Town of Cave Creek v. FAA*, 325 F.3d 320, 327 (D.C. Cir. 2003); *Coalition on Sensible Transp., Inc. v. Dole*, 826 F.2d 60, 66 (D.C. Cir. 1987) (noting that an agency need not prepare a full EIS "when a less comprehensive environmental review, or environmental assessment . . . , provides a basis for a finding of no significant impact").

Under NEPA, the FAA was required – at a minimum – to prepare an environmental assessment to determine whether the new runway use procedures at FLL will cause a "significant"

impact on the environment. The FAA's letter – which authorized the two secondary runways to be used for jet traffic to alleviate traffic congestion – was clearly "major federal action." "Major federal action" includes "actions with effects that may be major and which are potentially subject to Federal control and responsibility." 40 C.F.R. § 1508.18. In turn, the word "effects" includes both direct and indirect impacts, such as "ecological . . . , aesthetic, historic, cultural, economic, social or health" effects. *Id.* § 1508.8. Here, the FAA's new interpretation of the FLL noise compatibility program will have the effect of increasing the number of takeoffs and landings over noise-sensitive residential areas near the airport. For residents of these areas, there is at least a possibility that the noise, vibrations, and exhaust of low-flying jet aircraft will cause "major" ecological, aesthetic, or health effects. Thus, the letter was "major federal action" for which an environmental assessment was required.

The FAA's own environmental review policies confirm that the agency should have conducted an environmental assessment. In "Order 1050.1E," the FAA listed the types of agency actions that "normally requir[e] an environmental assessment." *See Environmental Impacts: Policies and Procedures*, FAA Order 1050.1E (June 8, 2004), at § 401.[3] One such action is "[n]ew or revised air traffic control procedures which routinely route air traffic over noise sensitive areas at less than 3,000 feet [above ground level]." *Id.* § 401n.

Thus, under NEPA and the agency's own environmental review policies, the FAA was required to perform an environmental assessment to determine whether the new runway

---

[3] Order 1050.1E is available at: http://www.faa.gov/regulations_policies/orders_notices/media/ALL 1050-1E.pdf.

use procedures were likely to cause a "significant" effect on the quality of the human environment. 40 C.F.R. § 1508.9(b) (noting that an environmental assessment should include "brief discussions of the need for the proposal . . . , of the environmental impacts of the proposed action and [its] alternatives, and a listing of agencies and persons consulted"); *Peterson,* 717 F.2d at 1415. After completing the environmental assessment, if the FAA finds the likely environmental impact to be significant, then the agency must produce a full EIS. Even if the impact is not found to be significant, the FAA must still issue a "finding of no significant impact" explaining why the new runway use procedures are unlikely to affect the quality of the environment. 40 C.F.R. § 1508.13. *See also Sierra Club v. Dep't of Transp.*, 753 F.2d 120, 126 (D.C. Cir. 1985) (noting that an agency need not prepare an EIS only when "a finding of no significant impact is made after analyzing the [environmental assessment]").

The FAA asserts that the increased use of runways 13/31 and 9R/27L for jet traffic will not have a significant impact on the environment. The agency points to data recently published in the Federal Register that purportedly shows that increased use of the secondary runways will not affect FLL's "noise contour." *Request for Public Comment on Noise Analysis for Fort Lauderdale-Hollywood Int'l Airport*, 71 Fed. Reg. 63,829, 63,833 (Oct. 31, 2006). This new data does not affect our conclusion that the letter must be set aside. Regardless of the ultimate *outcome* of the environmental review, the FAA was still required by NEPA to engage in the review *process*. The data recently published in the Federal Register is certainly relevant to the environmental review process, and presumably it should be included in the agency's environmental assessment. However, the FAA may not entirely discharge its environmental review obligations simply by pointing to one study that found no significant environmental impact. *See* FAA Order 1050.1E, §

404, Figure 4-2 (noting that an environmental assessment should discuss the purpose and need for the proposed action, reasonable alternatives to the proposed action (including the "no action" alternative), the environmental consequences of the proposed action, possible mitigation procedures, and the persons consulted during the environmental review process).

In sum, we grant the petition for review and set aside the June 23, 2005 letter for failure to follow the environmental review procedures required by NEPA.

**B.**

Petitioners also argue that the FAA failed to comply with the environmental review procedures set forth in Section 4(f) of the Transportation Act. That provision states:

[T]he Secretary may approve a transportation program or project . . . requiring the use of publicly owned land of a public park, recreation area, or wildlife and waterfowl refuge . . . , or land of an historic site . . . only if—

    (1) there is no prudent and feasible alternative to using that land; and

    (2) the program or project includes all possible planning to minimize harm to the park, recreation area, wildlife and waterfowl refuge, or historic site resulting from the use.

49 U.S.C. § 303(c). Petitioners contend that the new runway use procedures at FLL will "use" nearby parks by routing more jet traffic over these areas. Thus, they assert that the FAA was required to analyze whether there were "prudent and feasible alternatives" to the new procedures, and to do "all possible

planning to minimize harm" to the nearby parks.

The FAA argues that the Transportation Act does not apply to the June 2005 letter because the letter did not change any air traffic procedures, and thus did not "approve a transportation program or project" under section 4(f). To the contrary, as we held above in Section III, the 2005 letter was a new interpretation of the noise compatibility plan that had the effect of changing longstanding runway use procedures at FLL – the letter was not merely a recitation of existing policy. As to whether these procedures will "use" nearby parks under section 4(f) of the Transportation Act, it is the agency's responsibility to determine in the first instance whether an action constitutes a "transportation program or project . . . requiring the use of publicly owned land of a public park." *See* FAA Order 1050.1E, App. A, § 6.2e (noting that the FAA must make an "initial assessment" of whether section 4(f) applies to a given project). As we are vacating the letter order on other grounds, the FAA will have the opportunity on remand to consider those issues.

## V.

The FAA's June 23, 2005 letter is a reviewable "final order" because it adopts a new interpretation of the noise compatibility program, and thus has the effect of altering longstanding runway use procedures at FLL. On the merits, we grant the petition for review and set aside the letter because the FAA failed to follow the environmental review procedures required by NEPA and the agency's own environmental review policies.

*So ordered.*