# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued November 18, 2013　　　Decided December 24, 2013

No. 12-5300

WILDEARTH GUARDIANS, ET AL.,
APPELLANTS

POWDER RIVER BASIN RESOURCE COUNCIL, CA-11-037,
APPELLANT

v.

SALLY JEWELL, SECRETARY, U.S. DEPARTMENT OF INTERIOR,
ET AL.,
APPELLEES

Consolidated with 12-5312

Appeals from the United States District Court
for the District of Columbia
(No. 1:10-cv-01174)

*Samantha Ruscavage-Barz* argued the cause for the appellants. *Scott Gollwitzer* and *Matt Kenna* were on brief. *Michael P. Senatore* entered an appearance.

*J. David Gunter II*, Attorney, United States Department of Justice, argued the cause for the appellees.

*James Kaste,* Senior Assistant Attorney General, Office of the Attorney General for the State of Wyoming, *Creighton R. Magid*, *Andrew C. Emrich* and *John A. Bryson* were on brief for intervenors Antelope Coal, LLC, et al. in support of the appellees. *Michael J. McGrady*, Senior Assistant Attorney General, Office of the Attorney General for the State of Wyoming, and *Jay C. Johnson* entered appearances.

Before: HENDERSON and BROWN, *Circuit Judges*, and GINSBURG, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

KAREN LeCRAFT HENDERSON, *Circuit Judge*: In April 2005, Antelope Coal LLC (Antelope Coal) filed an application with the Bureau of Land Management (BLM), an agency within the U.S. Department of the Interior (Interior), requesting that a tract of federal land adjacent to Antelope Coal's existing mine in the Wyoming Powder River Basin be offered for competitive lease sale to interested parties. In March 2010 the BLM issued a Record of Decision (ROD), dividing the land into two tracts (the West Antelope II tracts) and offering them for lease through separate competitive bidding processes. WildEarth Guardians, Defenders of Wildlife, the Sierra Club (collectively, WildEarth) and the Powder River Basin Resource Council (PRBRC and, collectively with WildEarth, Appellants) challenge the BLM's decision to approve the West Antelope II tracts for lease. They argue that the Final Environmental Impact Statement (FEIS) supporting the ROD is deficient in several respects. The district court granted summary judgment to the defendants,[1] finding that the plaintiffs lacked standing to raise

---

[1] The defendants include Interior Secretary Sally Jewell, the BLM and the United States Fish and Wildlife Service. The district court permitted Antelope Coal, the State of Wyoming and the

one of their arguments and that their remaining arguments failed on the merits. We conclude that, while they do have standing, their merits arguments fall short. Accordingly, we affirm the judgment of the district court.

**I**

**A**

Under the Mineral Leasing Act (MLA), 30 U.S.C. §§ 181 *et seq.*, the Interior Secretary is authorized to offer leases on tracts of federal land suitable for coal mining and to award such leases based on a competitive bidding process. *Id.* § 201(a)(1). Pursuant to its authority under the MLA, *see id.* § 189, the BLM has promulgated regulations governing the competitive leasing of rights to extract federal coal. *See* 43 C.F.R. pt. 3420.

The National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. §§ 4321 *et seq.*, requires federal agencies, including the BLM, to consider and report on the environmental effect of their proposed actions. *See Theodore Roosevelt Conservation P'ship v. Salazar (Theodore Roosevelt I)*, 616 F.3d 497, 503 (D.C. Cir. 2010). "NEPA is an 'essentially procedural' statute intended to ensure 'fully informed and well-considered' decisionmaking . . . ." *New York v. NRC*, 681 F.3d 471, 476 (D.C. Cir. 2012) (quoting *Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 558 (1978)). "NEPA has twin aims. First, it places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action. Second, it

National Mining Association to intervene as defendants. *See WildEarth Guardians v. Salazar*, 272 F.R.D. 4 (D.D.C. 2010). The district court also dismissed one of WildEarth's claims on the pleadings, which claim is not appealed. *See WildEarth Guardians v. Salazar*, 783 F. Supp. 2d 61 (D.D.C. 2011).

ensures that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process." *Balt. Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983) (citation and quotation marks omitted); *accord Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 768 (2004). To meet these aims, NEPA requires an agency to prepare, and solicit public comment on, an environmental impact statement (EIS) whenever it proposes a "major Federal action[] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). The EIS must consider, *inter alia*, "the environmental impact of the proposed action," *id.* § 4332(2)(C)(i); "any adverse environmental effects which cannot be avoided," *id.* § 4332(2)(C)(ii); *see Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 351–52 (1989); and any "alternatives to the proposed action," 42 U.S.C. § 4332(2)(C)(iii); *see Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 194–95 (D.C. Cir. 1991) (noting that "alternatives" is not self-defining and "must be moored to 'some notion of feasibility' " (quoting *Vt. Yankee*, 435 U.S. at 551)). The EIS is to be prepared in consultation with any federal agency with special expertise relating to the environmental impact involved, 42 U.S.C. § 4332(2)(C) (flush language), and the Environmental Protection Agency (EPA) must review it and submit written comments, *see id.* § 7609(a). The EIS also must include a "cumulative impact" analysis addressing "the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions" of any agency or individual. 40 C.F.R. § 1508.7; *see* 40 C.F.R. § 1508.25; *TOMAC, Taxpayers of Mich. Against Casinos v. Norton*, 433 F.3d 852, 864 (D.C. Cir. 2006). NEPA does not, however, "require agencies to elevate environmental concerns over other appropriate considerations. . . . [I]t require[s] only that the agency take a 'hard look' at the environmental consequences before taking a major action." *Balt. Gas & Elec.*, 462 U.S. at

97 (citation omitted) (quoting *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976)). It requires informed decisionmaking "but not necessarily the best decision." *New York*, 681 F.3d at 476; *see also Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 23 (2008) ("NEPA itself does not mandate particular results." (quoting *Robertson*, 490 U.S. at 350)).

The BLM is also constrained by the Federal Land Policy and Management Act of 1976 (FLPMA), 43 U.S.C. §§ 1701 *et seq.*, which requires it to "manage the public lands under principles of multiple use and sustained yield," *id.* § 1732(a). Multiple use requires balancing the competing uses of land, *id.* § 1702(c); sustained yield requires the BLM to control depleting uses over time, *id.* § 1702(h). *See also Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 58 (2004). The BLM does so by using a "multi-step planning and decisionmaking process" that begins with the formation of a land use plan for a geographic region called a resource management plan. *Theodore Roosevelt I*, 616 F.3d at 504; *see* 43 C.F.R. § 1601.0-5(n) (describing contents of resource management plan). The resource management plan "does not, however, include a decision whether to undertake or approve any specific action. Specific projects are reviewed and approved separately, but must conform to the relevant [plan]." *Theodore Roosevelt I*, 616 F.3d at 504 (citing 43 C.F.R. §§ 1601.0-5(n), 1610.5-3(a)); *see also Norton*, 542 U.S. at 59–60.

**B**

The Wyoming Powder River Basin is the largest source of coal in the United States. It accounted for more than 33 per cent of all coal mined in the United States in 2003. An increasing percentage of the coal mined in the United States in recent years comes from the Powder River Basin because its coal is lower in sulfur than most coal, contains less fly ash

when burned and can be mined using surface mining methods that are generally safer and less labor intensive than underground mining.

Antelope Coal operates a coal mine (Antelope Mine) in the Wyoming Powder River Basin. The Antelope Mine produced 33.9 million tons of coal in 2006, representing 7.9 per cent of the coal produced in the Wyoming Powder River Basin and 1.1 per cent of the estimated carbon dioxide ($CO_2$) emissions in the United States. If production continues at average historical rates, the Antelope Mine's coal reserves will be depleted within the decade. In order to extend the life of the mine, Antelope Coal sought to lease the West Antelope II tracts, encompassing 4,100 acres of federal coal reserves on two separate tracts adjacent to the mine.

On April 6, 2005, Antelope Coal applied to the BLM, requesting that the West Antelope II tracts be offered for competitive lease sale. On October 17, 2006, the BLM published a notice of its intent to prepare an EIS for leasing the West Antelope II tracts and announced that it planned to hold a public "scoping" hearing to solicit comments on the issues to be considered in the EIS. On February 8, 2008, the EPA published a notice of the availability of the draft EIS and solicited public comment on it. The BLM received comments on the draft EIS at a public hearing and in writing. On December 19, 2008, the EPA published a notice of the availability of the FEIS. The FEIS spans nearly five hundred pages and includes the BLM's responses to public comments on the draft EIS. The BLM solicited further public comment on the FEIS and issued written responses to the comments it received. On March 25, 2010, the BLM issued the ROD, approving Antelope Coal's application and dividing the land into two tracts, each to be offered for lease by competitive bidding. Antelope Coal won the bidding for both leases and the leases became effective in 2011.

After the BLM approved the leases, WildEarth and the PRBRC each filed a notice of administrative appeal with the Interior Board of Land Appeals (IBLA).  WildEarth sought a stay of the ROD pending appeal but the IBLA did not act on WildEarth's motion within 45 days, thus making the ROD the BLM's final agency action in WildEarth's appeal.  43 C.F.R. § 4.21(a)(3), (c).  The PRBRC pursued its administrative appeal and the IBLA affirmed the ROD in full.  *See Powder River Basin Res. Council*, 180 IBLA 119 (2010); *see also* 43 C.F.R. § 4.21(d) (IBLA decision is final agency action).  WildEarth and the PRBRC filed separate complaints in the district court raising similar challenges to the adequacy of the FEIS.[2]  The district court consolidated the two cases and, upon the parties' cross-motions, granted summary judgment to the defendants on all claims.  *WildEarth Guardians v. Salazar*, 880 F. Supp. 2d 77 (D.D.C. 2012).  Both WildEarth and the PRBRC timely appealed.

## II

### A.  Standing

We begin with standing.  *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998).  The party invoking federal jurisdiction bears the burden of establishing the elements of Article III standing:

> First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or

---

[2] We note that, although the Appellants' claim may not have been ripe when first pursued in district court, it has since ripened because leases have been issued to Antelope Coal for the tracts. Recording of Oral Argument at 9:40 (Nov. 18, 2013); *see Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 480–82 (D.C. Cir. 2009).

imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (citations, quotation marks and alterations omitted); *accord Texas v. EPA*, 726 F.3d 180, 198 (D.C. Cir. 2013). "[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977); *accord Am. Trucking Ass'ns, Inc. v. Fed. Motor Carrier Safety Admin.*, 724 F.3d 243, 247 (D.C. Cir. 2013), *petition for cert. filed*, 82 U.S.L.W. 3259 (U.S. Oct. 17, 2013) (13-509). We have little difficulty concluding that the latter two elements of associational standing are met here and focus on whether the members of WildEarth or the PRBRC would otherwise have standing to sue in their own right.

As we discuss in Section II.B, *infra*, the Appellants claim that the BLM failed to adequately consider several environmental concerns, including the increase in local pollution and global climate change caused by future mining, before authorizing the leasing of the West Antelope II tracts. Their claim describes the "archetypal procedural injury"—an agency's failure to prepare (or adequately prepare) an EIS before taking action with adverse environmental consequences. *Nat'l Parks Conservation Ass'n v. Manson*,

414 F.3d 1, 5 (D.C. Cir. 2005); *see Defenders of Wildlife*, 504 U.S. at 572 & n.7. Although we relax the redressability and imminence requirements for a plaintiff claiming a procedural injury, "the requirement of injury in fact is a hard floor of Article III jurisdiction that cannot be removed by statute." *Summers v. Earth Island Inst.*, 555 U.S. 488, 497 (2009); *accord Nat'l Ass'n of Home Builders v. EPA*, 667 F.3d 6, 15 (D.C. Cir. 2011). A procedural injury claim therefore must be tethered to some concrete interest adversely affected by the procedural deprivation: "[A] procedural right *in vacuo* . . . is insufficient to create Article III standing." *Summers*, 555 U.S. at 496.

The procedural injury the Appellants claim—the allegedly deficient FEIS—is tied to their respective members' concrete aesthetic and recreational interests. "[E]nvironmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 183 (2000) (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972)). In support of their summary judgment motion, the Appellants submitted affidavits from several of their members attesting to those members' aesthetic interests in the land surrounding the West Antelope II tracts and specific plans to visit the area regularly for recreational purposes. We agree that, as the district court found and the parties do not dispute, the affidavits suffice to show that some of the Appellants' members will be injured by the increase in local air, water and land pollution that will result from mining on the West Antelope II tracts. *See Friends of the Earth*, 528 U.S. at 181–83; *Defenders of Wildlife*, 504 U.S. at 562–64.

As for causation, in a case alleging a procedural deficiency, "an adequate causal chain must contain at least two

links: one connecting the omitted EIS to some substantive government decision that may have been wrongly decided because of the lack of an EIS and one connecting that substantive decision to the plaintiff's particularized injury." *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 668 (D.C. Cir. 1996) (en banc); *see also Defenders of Wildlife v. Perciasepe*, 714 F.3d 1317, 1323 (D.C. Cir. 2013) (causation requirement not relaxed). The first link does not require the plaintiff to show that but for the alleged procedural deficiency the agency would have reached a different substantive result. *See City of Dania Beach, Fla. v. FAA*, 485 F.3d 1181, 1186 (D.C. Cir. 2007); *Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1160 (D.C. Cir. 2005). "All that is necessary is to show that the procedural step was connected to the substantive result." *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007) (quoting *Sugar Cane Growers Coop. of Fla. v. Veneman*, 289 F.3d 89, 94–95 (D.C. Cir. 2002)); *accord Defenders of Wildlife*, 504 U.S. at 572 n.7. But a plaintiff "must still demonstrate a causal connection between the agency action and the alleged injury." *City of Dania Beach, Fla.*, 485 F.3d at 1186; *accord Ctr. for Law & Educ.*, 396 F.3d at 1160; *see also Fla. Audubon Soc'y*, 94 F.3d at 664–65 ("[A] procedural-rights plaintiff must show not only that the defendant's acts omitted some procedural requirement, but also that it is substantially probable that the procedural breach will cause the essential injury to the plaintiff's own interest."). We think the Appellants have done so here because the local pollution that causes their members' aesthetic and recreational injuries follows inexorably from the decision to authorize leasing on the West Antelope II tracts.

The relaxed redressability requirement is also satisfied. *See Ctr. for Law & Educ.*, 396 F.3d at 1160 & n.2 (discussing relationship between causation and redressability); *Fla. Audubon Soc'y*, 94 F.3d at 668 (first causal link "foreshadows"

redressability). Vacatur of the BLM order would redress the Appellants' members' injuries because, if the BLM is required to adequately consider each environmental concern, it could change its mind about authorizing the lease offering. *See Lemon v. Geren*, 514 F.3d 1312, 1315 (D.C. Cir. 2008); *City of Dania Beach, Fla.*, 485 F.3d at 1186. We therefore conclude that the Appellants have standing to challenge the procedural inadequacy of the BLM's decision—namely, the alleged deficiencies in the FEIS—based on their members' aesthetic and recreational injuries caused by local pollution.

The district court used this analysis insofar as it applied to the Appellants' argument that the BLM failed to adequately address local pollution. *WildEarth Guardians*, 880 F. Supp. 2d at 86–87. The court went on, however, to address separately their standing to argue that the FEIS failed to adequately address the impact of the leasing decision on global climate change. *Id.* at 83. It found they lacked standing to raise the argument because they could not demonstrate a link between their members' recreational and aesthetic interests, "which are uniformly local, and the diffuse and unpredictable effects of [greenhouse gas] emissions." *Id.* at 84. The district court therefore seemed to require that the specific type of pollution causing the Appellants' aesthetic injury—here, local pollution—be the same type that was inadequately considered in the FEIS. In this respect, we think it sliced the salami too thin. *Cf. Duke Power Co. v. Carolina Envtl. Study Grp. Inc.*, 438 U.S. 59, 78–79 (1978) (rejecting contention that, excepting taxpayer suit, plaintiff who has otherwise established elements of Article III standing must also demonstrate nexus between right asserted and injury alleged).

In *Center for Biological Diversity v. U.S. Department of Interior*, environmental groups challenged Interior's decision to expand leasing areas for oil and gas development off the coast of Alaska. 563 F.3d 466 (D.C. Cir. 2009). We

concluded that the petitioners had satisfied neither the injury in fact nor the causation requirements of standing based on their claim that expanded drilling would contribute to global climate change which in turn would threaten their members' enjoyment of the area and indigenous animal species. *Id.* at 475–79; *see also Wash. Envtl. Council v. Bellon*, 732 F.3d 1131, 1141–46 (9th Cir. 2013) (finding no causal link between regulatory failure and assumed injury from climate change). We think (and the Appellants do not dispute) that the Appellants likewise cannot establish standing based on the effects of global climate change. But they have established a separate injury in fact not caused by climate change—the harm to their members' recreational and aesthetic interests from *local* pollution. In *Center for Biological Diversity*, we noted that "Interior's adoption of an irrationally based Leasing Program could cause a substantial increase in the risk to" petitioners' similar aesthetic injury—"their enjoyment of the animals affected by the offshore drilling"—and held that this gave petitioners standing to challenge the decision to authorize the leasing even though the claimed deficiencies concerned Interior's failure to consider greenhouse gas emissions and global climate change. 563 F.3d at 479. The same reasoning applies here. The Appellants' aesthetic injury follows from an inadequate FEIS whether or not the inadequacy concerns the same environmental issue that causes their injury. If we vacate the BLM order, their injury will be redressed regardless whether the FEIS's specific flaw relates to local or global environmental impacts; either way, the remedy is "limited to the inadequacy"—here, a deficient FEIS—"that produced the injury in fact that the plaintiff has established." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 353 (2006) (quoting *Lewis v. Casey*, 518 U.S. 343, 357 (1996)).

This Court once held that "having established standing to challenge the adequacy of the FEIS on at least one ground,

[plaintiffs] are entitled to raise other inadequacies in the FEIS." *Sierra Club v. Adams*, 578 F.2d 389, 392 (D.C. Cir. 1978). We rested this statement on the premise that a plaintiff may invoke "the 'public interest' in requiring government officials to discharge faithfully their statutory duties under NEPA." *Id.* at 392; *see also Morton*, 405 U.S. at 737. We express no opinion on whether the "public interest" rationale remains cognizable in light of subsequent Supreme Court precedent. *See, e.g.*, *DaimlerChrysler*, 547 U.S. at 351–53 (rejecting "commutative" theory of standing whereby standing as to one claim would suffice for all claims arising from same nucleus of operative fact); *see also id.* at 353 n.5 (distinguishing *Adams* from case at bar but expressing no opinion on its validity); *Lewis*, 518 U.S. at 358 n.6 (where injunction requiring provision of certain services to inmates concerned inadequacies other than those that harmed plaintiffs, noting that "standing is not dispensed in gross. If the right to complain of *one* administrative deficiency automatically conferred the right to complain of *all* administrative deficiencies, any citizen aggrieved in one respect could bring the whole structure of state administration before the courts for review."). We rest our holding on a different rationale. The Appellants may challenge each of the alleged inadequacies in the FEIS because each constitutes a procedural injury connected to their members' recreational and aesthetic injuries: Their members' injuries are caused by the allegedly unlawful ROD and would be redressed by vacatur of the ROD on the basis of any of the procedural defects identified in the FEIS.[3] Contrary to the BLM's assertion, the Appellants

---

[3] The familiar principle that a plaintiff must demonstrate standing for each form of relief sought, *see Summers*, 555 U.S. at 493; *DaimlerChrysler*, 547 U.S. at 352, is not to the contrary. The Appellants seek only one type of relief relevant here—the vacatur of the BLM's leasing decision. They simply advance several

adequately raised their theory of procedural injury below and we therefore conclude that they have standing to challenge each of the alleged deficiencies in the FEIS.

## B.   The Merits

We apply the arbitrary and capricious standard of the Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq.*, to the merits of the Appellants' NEPA and FLPMA challenges and review *de novo* the district court's grant of summary judgment. *Theodore Roosevelt I*, 616 F.3d at 507; *Nevada v. Dep't of Energy*, 457 F.3d 78, 87 (D.C. Cir. 2006); *see* 5 U.S.C. § 706(2)(A).   In doing so, we are mindful that our role is not to " 'flyspeck' an agency's environmental analysis, looking for any deficiency no matter how minor."   *Nevada*, 457 F.3d at 93.   Rather, it is "simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious."   *City of Olmsted Falls, Ohio v. FAA*, 292 F.3d 261, 269 (D.C. Cir. 2002) (quoting *Balt. Gas & Elec.*, 462 U.S. at 97–98).   In short, "an agency must take a 'hard look' at the environmental effects of its proposed action."   *Theodore Roosevelt Conservation P'ship v. Salazar (Theodore Roosevelt II)*, 661 F.3d 66, 75 (D.C. Cir. 2011); *accord Balt. Gas & Elec.*, 462 U.S. at 97.   While the Appellants raise numerous challenges to the sufficiency of the FEIS, we find none has merit and consider only two worthy of discussion.

### 1.   Global Climate Change

We turn first to the Appellants' argument that the BLM did not take a hard look at the effect of its leasing decision on

---

arguments in support of that claim.   *Cf. Am. Petroleum Inst. v. EPA*, 72 F.3d 907, 911–12 (D.C. Cir. 1996).

global climate change.[4] In the FEIS, the BLM discussed at length the prevailing scientific consensus on global climate change and coal mining's contribution to it. The BLM estimated the greenhouse gas (GHG) emissions that occurred at the Antelope Mine in 2007 and projected emissions for a typical year of operations if the West Antelope II tracts are also leased. It projected that, with the addition of the West Antelope II tracts, Antelope Mine would account for only .63 per cent of state-wide emissions of carbon dioxide equivalent ($CO_{2e}$). At the same time, the BLM noted that several factors made any projection about future emissions speculative. First, the BLM does not authorize mining through the issuance of a coal lease; rather, a mining permit must be obtained from the Wyoming Department of Environmental Quality with oversight from an independent federal agency, the Office of Surface Mining, and therefore mitigation measures can be imposed at a later stage. Joint Appendix (JA) 422–23; *see* 30 U.S.C. §§ 1253, 1273(c). The BLM further assumed that mining would continue at existing production rates and the coal would continue to be used to generate electricity by coal-fired power plants. Finally, the BLM identified considerable uncertainty about regulatory and technological developments that could affect future emissions.

---

[4] The district court did not reach this issue and the Appellants therefore ask us to remand. The parties have briefed the issue, however, and at argument the Appellants indicated they have little more to add. The agency record is before us, our review of the district court's decision post-remand would be *de novo* and we think the merits of the issue are clear. Indeed, the only purpose served by remand would be to satisfy the Appellants' evident desire to delay mining on the West Antelope II tracts. We think it appropriate to resolve the issue now. *See Friends of Blackwater v. Salazar*, 691 F.3d 428, 434 n.* (D.C. Cir. 2012).

16

The Appellants allege several inadequacies in the BLM analysis but they are of the flyspecking variety. First, they contend that the BLM's estimate of Antelope Mine's contribution to state-wide emissions failed to incorporate an analysis of the impact of these emissions, particularly their cumulative impact together with emissions from eleven other pending lease applications in the Powder River Basin. We think the BLM satisfied its obligation to consider "the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions." 40 C.F.R. § 1508.7; *see TOMAC*, 433 F.3d at 864. The BLM quantified average $CO_2$ or $CO_{2e}$ emissions for the Antelope Mine, for Wyoming and for the United States. From these figures it quantified the Antelope Mine's contribution to state-wide $CO_{2e}$ and nation-wide $CO_2$ emissions and the Wyoming Powder River Basin's contribution to nation-wide $CO_2$ emissions. It also projected Antelope Mine's contribution to state-wide emissions going forward. Although it did not discuss specific global impacts that would result from additional emissions, the BLM explained that "[g]iven the state of the science, it is not possible to associate specific actions with the specific global impacts such as potential climate effects." JA 891. This conclusion is supported by draft guidance from the Council on Environmental Quality (CEQ).[5] *See* JA 1281 ("[I]t is not currently useful for the NEPA analysis to attempt to link specific climatological changes, or the environmental impacts thereof, to the particular project or emissions, as such direct linkage is difficult to isolate and to understand. The estimated level of GHG emissions can serve

---

[5] The CEQ promulgates regulations that implement NEPA. *See* 40 C.F.R. § 1500.1; *see also Robertson*, 490 U.S. at 355 (CEQ regulations "are entitled to substantial deference"). As the BLM concedes, the draft guidance is not an authoritative interpretation of NEPA's requirements entitled to deference but nevertheless we find it useful.

as a reasonable proxy for assessing potential climate change impacts, and provide decision makers and the public with useful information for a reasoned choice among alternatives."). Because current science does not allow for the specificity demanded by the Appellants, the BLM was not required to identify specific effects on the climate in order to prepare an adequate EIS.

As for consideration of the eleven other pending lease applications, the Appellants have not shown that approval of the applications was "reasonably foreseeable." Granted, when WildEarth filed its brief in the district court in 2011, it asserted that the eleven lease applications "certainly qualify as 'reasonably foreseeable future actions,' given that BLM has already prepared EISs for all of these leases, recently held a sale for one lease, recently issued RODs for three leases, and has four RODs currently pending." JA 57 (WildEarth brief in district court); *see also* JA 989 (listing eleven applications). But hindsight is 20-20. In December 2008, when the BLM issued the FEIS, it had issued drafts EISs for only four of the eleven leases; seven had not passed the "scoping" stage. *See* http://www.blm.gov/wy/st/en/programs/energy/Coal_Resourc es/PRB_Coal/lba_title.html (last visited December 15, 2013). Because "projects in their infancy have uncertain futures," it was neither arbitrary nor capricious for the BLM to omit the eleven proposed leases from its analysis of reasonably foreseeable future actions. *Theodore Roosevelt I*, 616 F.3d at 513. (Hindsight bears this out: Although five of the leases have now been sold, one was rejected and five are either pending or have been suspended. *See* http://www.blm.gov/ wy/st/en/programs/energy/Coal_Resources/PRB_Coal/lba_titl e.html (last visited December 15, 2013)). Instead of assuming, as the Appellants do, that every pending lease application will be approved, the BLM evaluated GHG emissions as a percentage of state- and nation-wide emissions.

We think this approach suffices. *See Mayo Found. v. Surface Transp. Bd.*, 472 F.3d 545, 555–56 (8th Cir. 2006) (modeling of emissions on both regional and national levels sufficient if local modeling infeasible and requirements of 40 C.F.R. § 1502.22(b) satisfied); *see also Morris v. NRC*, 598 F.3d 677, 693 (10th Cir. 2010) (FEIS need not quantify amount of radiation emitted from other sources if it considered effect of radiation from past mining and proposed operation and determined that issuance of new license would have only negligible effect on amount of radiation emitted).

The Appellants also argue that the BLM failed to analyze a reasonable range of alternatives to address GHG emissions and climate change. The BLM discussed five separate alternatives in the FEIS at length, however, and analyzed the environmental impact of each. The Appellants nevertheless protest that the FEIS did not adequately consider a list of alternative ideas that WildEarth submitted in a single paragraph in response to the FEIS. We sense a bit of sandbagging here. The PRBRC participated in the scoping hearing that preceded the draft EIS and submitted written comments on the draft EIS and WildEarth submitted written comments on the draft EIS that specifically addressed the draft's discussion of reasonable alternatives. At no point did either WildEarth or the PRBRC mention the list of alternatives WildEarth raised at the last minute. To be sure, the BLM invited written comments on the FEIS, *see* 40 C.F.R. § 1503.1(b), and it had the opportunity to respond before it issued the ROD. But WildEarth's final comments did not really respond to the FEIS; instead, they raised new issues. We generally apply a deferential "rule of reason" to govern "both *which* alternatives the agency must discuss, and the *extent* to which it must discuss them," *Citizens Against Burlington*, 938 F.2d at 195 (emphasis in original) (quotation marks omitted); *see also Nevada*, 457 F.3d at 93, and we think

the last-ditch, kitchen-sink nature of WildEarth's suggestions bears on the extent to which the BLM was required to address them. *See Vt. Yankee*, 435 U.S. at 553–54 ("[A]dministrative proceedings should not be a game or a forum to engage in unjustified obstructionism by making cryptic and obscure reference to matters that 'ought to be' considered and then, after failing to do more to bring the matter to the agency's attention, seeking to have that agency determination vacated on the ground that the agency failed to consider matters 'forcefully presented.' "). The BLM responded to WildEarth's comments by referring WildEarth to the portion of the FEIS that does address a full range of alternatives and reminding WildEarth that the BLM does not issue mining permits and therefore further alternatives could also be addressed at the permitting stage. We think the BLM acted reasonably by responding in this manner. We therefore agree with the IBLA that the BLM satisfied its obligations under NEPA to consider climate change. *See Powder River Basin Resource Council*, 180 IBLA at 134.

## 2. Local Pollution

Next we consider the Appellants' argument that the BLM failed to take a hard look at the effect the lease developments would have on local ozone levels. Ground level ozone is a pollutant that forms when emissions of nitrogen oxides ($NO_x$) and volatile organic compounds react to sunlight. There are several types of $NO_x$, the most toxic being nitrogen dioxide ($NO_2$). Inhalation of ground level ozone is associated with several health risks, which the FEIS discussed. While the EPA has established National Ambient Air Quality Standards (NAAQS) for ozone and $NO_2$, *see Coal. for Responsible Regulation, Inc. v. EPA*, 684 F.3d 102, 132 (D.C. Cir. 2012), *cert. granted in part* 134 S. Ct. 418 (2013), there is no corresponding NAAQS for $NO_x$.

In the FEIS, the BLM noted that the area around the West Antelope II tracts is in attainment—*i.e.*, in compliance with NAAQS—for all pollutants. JA 496, 789; *see* 42 U.S.C. § 7407(d)(1)(A)(ii); *see also* JA 932 (responding to comment regarding compliance with ozone NAAQS). The BLM projected that by 2010 emissions of $NO_2$ would remain well below NAAQS; further, the FEIS included an extensive discussion of the current and projected emissions of $NO_x$ and $NO_2$. *See* JA 510–17; JA 680–81.[6] The projection of $NO_2$ emissions was based on modeling done for the Powder River Basin Coal Review, "a regional technical study . . . to help evaluate the cumulative impacts of coal and other mineral development in the PRB." JA 648; *see* JA 678. No separate projection, however, was made for ozone. As the BLM explained, it addressed ozone in its discussion of $NO_x$ emissions because $NO_x$ is one of the main ingredients in the formation of ground level ozone and $NO_2$, in turn, is a type of $NO_x$. The BLM also noted that further modeling would be done at the permitting stage to ensure compliance with state and federal air quality standards.

The Appellants' objections to the BLM's analysis boil down to a dispute about the adequacy of using projected emissions of ozone precursors—like $NO_x$ and $NO_2$—as proxies by which to analyze the impact of future ozone levels. They point to one report in the record observing that there is not a one-to-one correlation between $NO_x$ and ozone levels

---

[6] We agree with the Appellants that the BLM's interchangeable use of the terms $NO_x$ and $NO_2$ can be confusing, especially where it erroneously refers to a NAAQS for $NO_x$. JA 514; *see also* BLM Br. 31–32 (making same error). But we do not think one typo in a five-hundred page FEIS renders it insufficient where, as here, context makes the point clear. *Cf. US Magnesium, LLC v. EPA*, 630 F.3d 188, 193 & n.3 (D.C. Cir. 2011) (typo irrelevant where meaning could be readily ascertained).

because ozone produced per molecule of $NO_x$ emissions varies considerably depending on local conditions. *See* JA 995. But the same report observed that "[o]zone can be reduced by controlling . . . $NO_x$" and "[r]ural ozone is more sensitive to $NO_x$ controls," JA 994, which observation tends to confirm the appropriateness of the BLM's use of $NO_x$ as a proxy for ozone.

The Appellants also rely on an email from a BLM air quality specialist opining on the adequacy of the FEIS. We are dubious of the email's value, particularly because the BLM specialist began the email by noting that she had conducted "a very cursory review of the ROD" and was "not very familiar with the project and ha[d] not read the FEIS." JA 1348; *see WildEarth Guardians v. Nat'l Park Serv.*, 703 F.3d 1178, 1186–87 (10th Cir. 2013) (emails from local or lower-level agency representatives expressing diversity of opinion "will not preclude the agency from reaching a contrary decision, so long as the decision is not arbitrary and capricious and is otherwise supported by the record"); *cf. Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 658–59 (2007) (inconsistent statements by agencies' regional offices during early stages of review do not render decisionmaking process arbitrary and capricious where proper procedures are followed). In any event, the email did not suggest that it was inappropriate to rely on $NO_x$ models instead of modeling ozone separately. It merely stated that the reasons for the lack of ozone modeling should have been articulated better. JA 1348 ("[T]he response should include a concise explanation of ozone modeling and its limitations . . . and why this pollutant was not modeled."). The Appellants do not question the adequacy of the explanation for the absence of ozone modeling, however, only the use of $NO_x$ as a proxy.

We conclude that the BLM satisfied its obligations under NEPA. " 'The NEPA process involves an almost endless series of judgment calls,' and 'the line-drawing decisions

necessitated by the NEPA process are vested in the agencies, not the courts.' " *Duncan's Point Lot Owners Ass'n, Inc. v. FERC*, 522 F.3d 371, 376 (D.C. Cir. 2008) (quoting *Coal. on Sensible Transp., Inc. v. Dole*, 826 F.2d 60, 66 (D.C. Cir. 1987)) (alterations omitted). It may have been possible or even prudent for the BLM to separately model future ozone levels but we think that, given the limitations on such modeling and the critical role $NO_x$ plays in ozone formation, the BLM's projections and extensive discussion of $NO_x$ and $NO_2$ emissions suffice.

We have considered—and rejected—the Appellants' other arguments challenging the sufficiency of the FEIS and conclude that the FEIS complies with NEPA, the FLPMA and the MLA. We therefore affirm the district court's grant of summary judgment to the defendants.

*So ordered.*